## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**Aaron Cherrington; Amy**
**Cherrington; and Noodles 1, LLC,**

         **Plaintiffs,**

**v.**
                  **MEMORANDUM AND ORDER**
                  **Civil No. 04-4572 (MJD/JJG)**

**Wild Noodles Franchise Company,**
**LLC; Global Restaurant Development**
**Company, LLC; and Steve Leibsohn,**

         **Defendants.**

---

John D. Holland, Dady & Garner, PA, Counsel for Plaintiffs.

Robin Caneff Gipson, Briggs & Morgan, PA, Counsel for Defendant Steve
Leibsohn.

---

## I.    INTRODUCTION

This case involves a dispute under the Minnesota Franchise Act ("MFA").

This matter is before the Court on Defendant Steve Leibsohn's Motion for

Summary Judgement.  [Doc. No. 59.]  Oral argument was heard on June 2, 2006.

## II.    BACKGROUND

### A.    <u>The Parties</u>

Plaintiffs Amy and Aaron Cherrington are Minnesota residents, and Plaintiff

Noodles 1 LLC is a Minnesota corporation.  Defendants Wild Noodles and Global

Restaurant Development Company are Arizona corporations.  Wild Noodles serves

as the franchiser of the Wild Noodles franchise concept.  Defendant Leibsohn is an

Arizona resident, a part-owner of a Wild Noodles franchise, and from November

2003 through May 2004, was COO of Wild Noodles.

Beginning in 2000, World Noodles, the predecessor of Defendant Wild

Noodles, owned and operated two World Noodles restaurants in the Phoenix, AZ

area.  In early 2003, World Noodles LLC changed its name to Wild Noodles LLC,

and the two Phoenix-area restaurants also changed their names to Wild Noodles.

### B.    Defendant Leibsohn's Relationship to Wild Noodles

In April 2003, Defendant Leibsohn became Wild Noodles' first franchisee,

although his restaurant did not open until September 2004 because of delays in

construction of the strip mall that houses the restaurant.  On September 19, 2003,

Leibsohn put $200,000 in an escrow account to lend to Wild Noodles CEO and

owner George Krotonsky so that Krotonsky could buy out his partner, Dave

Andrea, in the event that Andrea rejected Krotonsky's initial buy out offer.[1]

(Leibsohn Aff. ¶ 10; Long Aff. Ex. 1.)  The escrow agreement makes no mention of

Leibsohn eventually obtaining an ownership interest in Wild Noodles.  (Id.)

_____

[1]Krotonsky and Andrea's ownership agreement contained a mandatory buy-sell agreement.

The loan was actually given to Krotonsky in November 2003.  (Leibsohn Aff. ¶ 11.)  At this time, Leibsohn assumed an ownership interest in Wild Noodles and assumed the title of COO.  The Court is unclear as to whether Leibsohn assumed a one percent or sixteen percent interest in Wild Noodles at this time. (Krotonsky Dep. at 150 (stating that Leibsohn acquired a sixteen percent interest at this time); Leibsohn Dep. at 87; 118 (indicating that Leibsohn may have obtained a one percent interest at this time that became a sixteen percent interest in March 2004).)  However, this potential dispute is immaterial, since the Parties agree that Leibsohn became COO in November 2003, and the Parties agree that by at least March 2004, Leibsohn owned sixteen percent of Wild Noodles.  Leibsohn obtained his sixteen percent in exchange for forgiveness of the $200,000 loan.  In his capacity as COO, Leibsohn had "very little" responsibility, worked only ten to fifteen hours per week, and was not paid.  (Krotonsky Dep. at 152-53.)  Rather, Leibsohn's duties during this time included the following:

1.  Critiquing food, designing garnishes, and finalizing the menu;

2.  Meeting with focus groups to develop brand and marketing plan;

3.  Drafting ten pages of a customer service manual that were never actually included in the finished manual;

4.  Designing a take-out bag;

5.  Giving input on restaurant decor;

6.  Attending openings of three franchises, including the Cherrington's

Lake Street location; and

7.      Communicating  with Aaron Cherrington regarding Tim Jasper,
        customer comment cards, and the possibility of getting a booth at the
        Minnesota State Fair.

(Def. Mem. Supp. Mot. Simm. J. at 7) (citations omitted).  According to Leibsohn,

he was never involved in the selling process, in preparing Uniform Franchise

Offering Circulars ("UFOCs"), or in the registration process.  (Leibsohn Dep. at 99-

100; 153; 166.)  In May 2004, Leibsohn abandoned the title of COO because he

wanted to devote his full attention to the opening of his franchise.  (Id. at 87-88.)

## C.      The Plaintiffs' Investment in the Wild Noodles Franchise

In September 2003, Plaintiffs began investigating the idea of opening a Wild

Noodles franchise.  Plaintiffs visited the Wild Noodles website for information.

The website stated that Wild Noodles had one of the best sales-to-investment

ratios in the industry and that there were two Wild Noodles locations then

currently open and operating.  On or around September 26, 2003, Plaintiffs

received a marketing brochure from Wild Noodles that stated the following: "(1)

the Wild Noodles concept is a 'turn-key' franchise system; (2) the maximum

typical investment cost is approximately $332,000, which includes the cost of

equipment and leasehold improvements; and (3) the Wild Noodles franchise

system has one of the best sales-to-investment ratios in the industry."  (Pl. Opp.

Mot. Simm. J. at 8 (citing Krotonsky Dep. Ex. 6).)

On or about September 30, 2003, Plaintiff Aaron Cherrington flew to

4

Arizona to meet with Wild Noodles representatives, including Leibsohn.  During

their meeting, Leibsohn told Cherrington that he was Wild Noodles' first

franchisee, but that his store was not yet open.  (Leibsohn Dep. at 109-10;

Cherrington Dep. at 238.)  Leibsohn also told Cherrington that he was excited

about the Wild Noodles concept because it was an opportunity to get in on the

ground floor of a new franchise system, that he liked having input about menu

items, and that Wild Noodles was letting him use an empty office.  (Id. at 105-06,

236; Leibsohn Dep. at 101-02, 109, 135.)  Leibsohn and Cherrington never

discussed food costs, labor costs, or anticipated revenues.  (Cherrington Dep. at

105-06.)

On October 24, 2003, the Cherringtons entered into an Area Development

Agreement ("ADA") that obligated them to open at least nine Wild Noodles

locations.  At the same time, the Cherringtons signed an agreement to open a

restaurant on Lake Street in Minneapolis.

Prior to the opening of the Cherrington's Lake Street restaurant, Aaron

Cherrington spoke with Leibsohn to complain that Wild Noodles' construction

manager Tim Jasper was not being responsive and that his restaurant was

experiencing cost overruns.  This phone call lasted seven to ten minutes, and

Leibsohn told Cherrington to be patient because Wild Noodles was a young

company and was still working things out.  When the Cherrington's Lake Street

store opened in May 2004, Leibsohn came to Minnesota to assist Cherrington by handing out fliers.

In June or July 2004, Cherrington emailed Leibsohn to inquire about customer comment cards and Leibsohn informed Cherrington that the cards would be delivered soon.  Cherrington also emailed Leibsohn to ask Leibsohn's opinion about Cherrington getting a booth at the Minnesota State Fair and Leibsohn stated that he thought that a state fair booth was a good idea. Cherrington never got the booth.

On or around June 29, 2004, Plaintiff Noodle 1 (wholly owned by the Cherringtons) entered into a Franchise Agreement with Wild Noodles for a Maple Grove Wild Noodles location.  On either September 30 or October 1, 2004, Cherrington met with Leibsohn and other Wild Noodles investors to tell them that he was contemplating closing or selling his restaurants.  In addition to these contacts, there is some dispute as to whether Leibsohn was involved in a phone conference with Cherrington in March 2004 when Cherrington was in training in Arizona, but this is not a disputed material fact since Leibsohn is not alleged to have made any misleading statements at this time.  (Def. Mem. Supp. Mot. Simm. J. at 10 n.7.)

D. **The Instant Lawsuit**

The Cherrington's franchises ultimately failed.  Only two of the required

nine locations ever opened – the Lake Street and Maple Grove locations – and both of those closed shortly after opening.

The Cherringtons and Noodles 1 (collectively "Plaintiffs") filed the instant lawsuit seeking to recover damages from Wild Noodles and its statutory control persons because they were "oversold" on the Wild Noodles franchise opportunity, and they were induced into the ADA by misrepresentations and/or omissions of material fact.

## III.   DISCUSSION

### A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Id.</u> at 323.  Summary judgment must be granted when the opposing party fails to make a showing that supports the existence of an element essential to the case and on which the opposing party bears the burden of proof at trial.  <u>Id.</u> at 322-23.  On a motion for summary judgment, all evidence is viewed in the light most favorable to the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  However, the nonmoving party may not rest on mere denials or

allegations in the pleadings, but must instead set forth specific facts sufficient to raise genuine issues for trial.  <u>Celotex</u>, 477 U.S. at 324.

**B.**     <u>**Plaintiffs' Allegations**</u>

Plaintiffs allege that Defendants violated the MFA through (1) alleged misrepresentations in Wild Noodles' brochures and marketing material promoting the Wild Noodles' franchise system; (2) Defendants' allegedly incomplete or inaccurate UFOC; (3) false representations made by various Wild Noodles representatives; and (4) an alleged lack of authorization to offer or sell franchises in Minnesota.

**C.**     <u>**Leibsohn's Arguments**</u>

Leibsohn argues that he is entitled to summary judgment for three reasons: (1) he is not a person covered by the Minnesota Franchise Act; (2) he had no knowledge of or reason to know of the alleged violations; and (3) there is no evidence that he materially aided in any act or transaction constituting the alleged violations.  Wild Noodles responds that summary judgment is inappropriate because genuine issues of material fact exist that can only be resolved by a jury.

The Court agrees with Magistrate Judge Graham who stated in her order on Plaintiffs' Motion to Amend for Punitive Damages that "[t]he only fact that meaningfully supports Leibsohn's involvement in misrepresentations by Wild

Noodles is his position as COO." (Doc. No. 77 at 11.) In a nutshell, Plaintiffs

argue that Leibsohn abandoned his COO responsibilities by not taking a firmer

hand in assuring that Wild Noodles' representations were true and correct, and

that Leibsohn is responsible for any representation made during his tenure as

COO.

## 1.    <u>Whether Leibsohn Was Covered by the MFA</u>

The MFA imposes liability on persons who directly or indirectly control a

franchisor in violation of the Act. The MFA provides, in pertinent part, the

following:

> Every person who directly or  indirectly controls a person liable [for
> violating the Act], every partner in a firm so liable, every principal
> executive officer or director of a corporation so liable, every person
> occupying a similar status or performing similar functions and every
> employee of a person so liable who <u>materially</u> <u>aids</u> in the act or
> transaction constituting the violation is also liable jointly and
> severally with and to the same extent as such person, unless the
> person who would otherwise be liable hereunder had no knowledge
> of or reasonable grounds to know of the existence of the facts by
> reason of which the liability is alleged to exist.

Minn. Stat. § 80C.17, subd. 2 (emphasis added).

## a.    <u>Statutory Interpretation</u>

Plaintiffs argue that Leibsohn was a "control person" under the MFA.

Specifically, Plaintiffs assert that the term "materially aids" modifies only the word

"employee," and not the categories of persons preceding "employee." Thus

according to Plaintiffs, officers, directors, and persons occupying a similar status

or performing similar duties may be liable under the MFA even if they did not "materially aid" in the violation, unless they did not know or had no reason to know of the facts giving rise to the alleged liability.

Plaintiffs aver that a reading that requires them to demonstrate that Leibsohn "materially aided" in the MFA violations would render the clause "unless the person who would otherwise be liable hereunder had no knowledge of or reasonable grounds to know of the existence of the facts by reason of which the liability is alleged to exist" a nullity. According to Plaintiffs, such a reading would mean that a plaintiff would need to prove not only that each control person "materially aided" in the violations, but also that the person had no knowledge or reason to know of the underlying violation. If that were a proper reading, there would be no need for the "safe harbor" provision of the MFA. Plaintiffs cite no authority for their reading of the statute, other than the generic statement that statutes must be interpreted to give them their plain meaning in the context of the statute as a whole. (Pl. Mem. Opp. Mot. Simm. J. at 22.)

The Court finds Plaintiffs' reading of the statute incorrect. This Court's opinion is in concert with the opinions of other courts that have interpreted this statute. For example, in <u>Randall v. Lady of America Franch. Corp.</u>, No. 04-3394 (JRT/FLN), the court concluded that in order for an executive officer to be held jointly and severally liable for a corporation's violations of the MFA, the officer

must "materially aid[] in the act or transaction constituting the violation."  2005

WL 2709641, at *2 (D. Minn. Oct. 21, 2005) (unpublished opinion).  In drawing

this conclusion, the <u>Randall</u> court relied on the Minnesota Court of Appeals

decision in <u>Avery v. Solargizer Int'l, Inc.</u>, 427 N.W.2d 675, 681 (Minn. Ct. App.

1988) which addressed the issue of corporate liability for common law fraud.  <u>Id.</u>

In <u>Dr. Performance of Minn., Inc. v. Dr. Performance Mgm't, LLC</u>, No. 01-

1524 (DSD/SRN), 2002 WL 31628440, at *4 (D. Minn. Nov. 12, 2002)

(unpublished opinion), the court reached the same conclusion.  Specifically, the

<u>Dr. Performance</u> court found that "[i]n order for personal liability to attach to

controlling persons under the [MFA], they must have been in positions of control

at the time of the alleged violation, or actively participated in the violation."  <u>Id.</u>

Thus, merely being an officer is not enough for liability to attach.

Moreover, other courts that have interpreted the exact or similar language

in other states' statutes also conclude that officers cannot be individually liable

unless they materially aid in fraudulent acts.  <u>See</u> <u>To-Am Equip. Co., Inc. v.</u>

<u>Mitsubishi Caterpillar Forklift America</u>, 913 F. Supp. 1148, 1153 (N.D. Ill. 1995)

(acknowledging that the lack of a comma before the clause "who materially aides

in the act or transaction constituting the violation" is confusing and concluding

that under the Illinois Franchise Disclosure Act, liability will not attach unless the

individual officer materially aids in the violation) (citing <u>Vukusich v.</u>

Comprehensive Accting. Corp., 501 N.E.2d 1332 (Ill. App. Ct. 1986)); A. J. Temple

Marble & Tile, Inc. v. Union Carbide Marble Care, Inc., 663 N.E.2d 890, 892-93

(N.Y. 1996) (reaching the same conclusion under the New York Franchise Sales

Act, which has the same language, but which contains commas that make the

meaning unambiguous).

Furthermore, the Court does not agree that this reading renders the clause

"unless the person who would otherwise be liable hereunder had no knowledge of

or reasonable grounds to know of the existence of the facts by reason of which the

liability is alleged to exist" a nullity.  It is not difficult to conceive of a situation in

which someone could materially aid in a violation without knowing of the

existence of facts by which liability is alleged to exist.  For example, someone

could make a representation based on information he or she had at the time

without knowing that the information was false or misleading because that

person, himself, was mislead.  Therefore, for Leibsohn to be liable, he must have

been a control person at the time of the alleged violations or must have materially

participated in the violation – his status as COO, alone, does not establish liability.

### b.    "Control Person"

"In order for personal liability to attach to controlling persons under the

[MFA], they must have been in positions of control at the time of the alleged

violation, or actively participated in the violation."  Dr. Performance, 2002 WL

31628440, at *4.  Plaintiffs argue that Leibsohn was a "person occupying a similar status or performing similar functions" to those of a control person at the time that "Wild Noodles representatives first made illegal earnings claims to [Plaintiffs] because, at such time, Leibsohn either owned or was poised to have a significant stake in a very small company," and had an "equity interest in Wild Noodles."  (Pl. Mem. Opp. Mot. Simm. J. at 23, 24.)

Plaintiffs allege that Leibsohn was more than a mere franchisee on September 30, 2003 because on September 19, 2003, he "paid" Krotonsky $200,000 "to become part owner."  (Id. at 24.)  Plaintiffs assert that Leibsohn's failure to tell them he was an owner was a material misrepresentation.  According to Plaintiffs, a genuine issue of material fact exists regarding Leibsohn's status as of September 2003.  For support, Plaintiffs cite pages 105-06 and 111-13 of Leibsohn's deposition.  However, this deposition testimony does not support the conclusion that Leibsohn was an owner at the time or that he even was guaranteed ownership in the future.  Rather, the testimony states the following:

> Q: When did you reach agreement as to how you would get your ownership interest?
> A: I would – we talked about a loan that would be converted at a later time.
>
> . . . . .
>
> Q: . . . .[Y]ou knew that you were going to be becoming an owner of the franchise company, didn't you?
> A: No.
> Q: You deny that?
> A: That was a possibility, but . . . Dave Andrea is a very difficult

person to work with and by no means was it, you know, a sure thing.

. . . . .

Q:    Isn't it the case, sir, that you did not tell my clients that you were a prospective owner the of this Wild Noodles Franchise Company?

A:    At that time I was – there was nothing to talk about.

Q:    Are you able to answer my question, please?  You are a well educated person.  I mean, you have other things you want to say.  Have your lawyer ask you questions and you can answer them then.  Right now my question is this, and if you could please just listen to the question and answer it: You did not disclose to my clients, did you, that you were a prospective owner of a Wild Noodles Franchise Company?

Atty:    Objection. Argumentative.

A:    I did not say that I was a prospective possible owner, no.

. . . . .

Q:    . . . .[Y]ou stood to gain financially if my client decided to . . . become a Wild Noodles franchisee?

A:    Not necessarily.

Q:    As a matter of fact, you weren't just a prospective owner as of September 30 of '03, you had already entered into agreements to make that happen by September 30 of '03, hadn't you?

A:    No, sir.

(Leibsohn Dep. at 105-06; 109; 111.)

The Court finds that Leibsohn was not a control person in September 2003.

First, at most, Leibsohn was a prospective lender with the hope of becoming an owner, something that did not occur until November 2003.  In this respect, this case is similar to Avery in which the Minnesota Court of Appeals found that corporate directors could not be liable under the MFA when they assumed their directorships after the franchise agreements at issue were signed.  See 427 N.W.2d at 680.  Second, as discussed above, the MFA makes no provision for liability

14

based simply on position – control is what is important.  Third, to the extent
Plaintiffs aver that Leibsohn was a person "occupying a similar status or
performing similar functions" after he became COO, that argument fails because
there is no evidence that Leibsohn was involved in marketing the franchise or in
making representations on behalf of Wild Noodles.  Leibsohn's short-lived COO
status was mostly related to product development or ceremonial functions.  There
is no indication that he controlled anyone who was liable under the MFA.  On the
one occasion that Cherrington spoke with Leibsohn in his "official" capacity, to
discuss his building overruns, he did so only because he had heard that Leibsohn
was now in management, not because anyone represented that Leibsohn was
responsible for construction of new franchises.  (Cherrington Dep. at 238-40.)

     Plaintiffs argue that Leibsohn admitted he was involved in marketing Wild
Noodles, but the record supports the conclusion that to the extent Leibsohn may
have been involved in marketing, it was related to the operation of the franchises
themselves with input on things like customer comment cards, the interior design
of the restaurants, and the design of take-out food bags.  This is different from
being involved in marketing the franchise to prospective franchisees.  Leibsohn
testified that he was never involved in selling the franchise, preparing UFOCs, or
registering franchises.  Thus, any "marketing" that Leibsohn did was not related to
any alleged violations of the MFA.

In conclusion, the Court finds that Leibsohn was not liable under the MFA because he was not a control person.  Moreover, as discussed below, Leibsohn did not materially aid in any act constituting a violation of the MFA and he did not have reason to know of any alleged violations of the MFA.

### 2.    Whether Leibsohn Materially Aided in Any Act or Transaction Constituting a Violation of the MFA

Leibsohn argues that there is no evidence that he aided any alleged MFA violation.  Indeed, the only statements attributed to Leibsohn in the Amended Complaint are that he "represented himself as a Wild Noodles franchisee" and that he stated that "he was very excited about the Wild Noodles concept, and that, based upon the brochures, pamphlets and representations made by Wild Noodles's representatives, [he] could not wait to open his Wild Noodles franchise."  (First Amend. Compl. ¶¶ 42-43.)[2]

Plaintiffs respond that as COO, Leibsohn's failure to correct the "illegal" representations of other Wild Noodles representatives is "simply inexcusable," especially since Leibsohn admitted that as COO he was "principally in charge of operating the company."  (Pl. Mem. Opp. Mot. Simm. J. at 17.)  For support,

---

[2]The Court will not consider any allegations in the Second Amended Complaint which was filed the day before the hearing on this motion.  All briefing for this motion was based on the allegations in the First Amended Complaint, and to allow new arguments at this stage would be inequitable.  At this juncture, the Court expresses no opinion regarding the timeliness or appropriateness of the Second Amended Complaint.

16

Plaintiffs cite Leibsohn's deposition at pages 87-89.  Moreover, Plaintiffs assert that a fact issue exists as to whether Leibsohn's expressed excitement about his Wild Noodles franchise was credible or rather just a sales process that was being directed by Wild Noodles and its other officers.  (Id. at 25.)  Plaintiffs further assert that Leibsohn's failure to do anything "to address Wild Noodles lack of a franchise compliance program," failure to learn whether Wild Noodles marketing efforts complied with the MFA, and failure to address Cherrington's concerns that he was experiencing cost overruns for the construction of his first franchise constitute ratification of the prior misrepresentations of Wild Noodles' representatives.  For support, Plaintiffs cite a California state case.

Plaintiffs misstate the record.  Leibsohn never stated that he knew he was "principally in charge of operating the company."  Rather, he testified that some COOs have those duties, but that it depends upon the company.  Leibsohn then unequivocally stated that his own COO responsibilities were "very limit[ed]." (Leibsohn Dep. at 89.)  Plaintiffs do not proffer any evidence to rebut this assertion.

Furthermore, the California case cited by Plaintiffs is not helpful. Plaintiffs cite Spahn v. Guild Indust. Corp., 94 Cal. App.3d 143 (1979) for the proposition that "[w]here control persons ratify the unlawful acts of a franchisor, they may be viewed as materially aiding in the statutory violation and will, consequently, be

subject to liability." (Pl. Mem. Opp. Mot. Simm. J. at 25.)  <u>Spahn</u> does not stand

for this proposition.  Rather, <u>Spahn</u> stands for the proposition that controlling

officers cannot be exempt from liability when they have knowledge that the

actions of their agents give rise to liability under the California Franchise

Investment Law, which contains language identical to the language at issue in this

case.  94 Cal. App.3d at 157-58.  This is not the situation presented in the instant

case because there is no evidence that Leibsohn controlled any of Wild Noodles'

representatives, agents, or employees.

Finally, to the extent that the Court considers Leibsohn's statement that he

was excited about his Wild Noodles Franchise, the statement cannot be

considered a misrepresentation.  Merely saying he was excited does not constitute

fraud-based inducement.  Moreover, this statement was made on September 30,

2003, two months before Leibsohn became COO and therefore, Leibsohn's failure

to mention that he was a potential lender and speculative owner was also not a

material misrepresentation.  Thus, Plaintiffs have failed to set forth any facts

demonstrating that Leibsohn materially aided in the alleged violations of the

MFA.  <u>See</u> <u>Randall</u>, 2005 WL 2709641, at *2.

### 3.   <u>Whether Leibsohn Had Knowledge or Reasonable Grounds to Know of the Alleged Violations</u>

Leibsohn argues that even if he was a control person, he cannot be liable

under the MFA because he did not know, nor did he have reason to know, of the

alleged violations.  Plaintiffs respond that "to excuse such an individual from having 'any reasonable grounds to know of' facts giving rise to Wild Noodles' violations of the MFA is simply impermissible given the remedial purpose of the MFA."  (Pl. Mem. Opp. Mot. Simm. J. at 17.)

Plaintiffs cite <u>Neptune Soc. Corp. v. Longanecker</u>, 194 Cal. App.3d 1233 (1987) and <u>Eastwood v. Froehlich</u>, 60 Cal. App.32d 523 (1976) for the proposition that a "putative control person bears the burden of proving that he or she had no knowledge or reasonable grounds to believe the franchisor was committing a statutory violation."  (<u>Id.</u> at 26.)  Even if the Court were to rely on these nonbinding cases, it is Plaintiffs who have failed to produce any evidence other than Leibsohn's COO title to rebut Leibsohn's claim that he had very minimal duties as a COO, and that none of those duties involved "control."  Thus, Leibsohn has met any burden he had to prove that he had no knowledge or reasonable grounds to believe Wild Noodles was committing a statutory violation – he simply was not in a position to know these things.

Plaintiffs' argument presents no facts to rebut the facts presented by Leibsohn that his COO duties were very limited.  Moreover, to the extent that Plaintiffs assert that the conversation between Cherrington and Leibsohn regarding cost overruns allegedly put Leibsohn on notice about violations of the MFA, that argument is without merit.  Under the MFA, relevant prohibited

19

communications include only communications related to the offer or sale of a franchise.  See Minn. Stat. § 80C.13, subd. 2.

      **D.**     **Whether Wild Noodles Was Registered to Offer Franchises in Minnesota**

Plaintiffs aver that Wild Noodles was offering franchises for sale in Minnesota when it was not authorized to do so because it was not yet registered with the Department of Commerce.  (Pl. Mem. Opp. Mot. Simm. J. at 11-12.)  It is unclear how Plaintiffs impute this failure to Leibsohn, other than by virtue of Leibsohn's position as COO.  As stated before, more than a title is needed to establish liability under the MFA.

**IV.**   **CONCLUSION**

Issues of material fact do not exist regarding whether Leibsohn was a control person under the MFA or whether he materially aided in fraud.  Rather, the record demonstrates that Plaintiffs' MFA claims against Leibsohn must be dismissed.  At the oral argument on this motion, Plaintiffs' attorney conceded that the only way any common law fraud liability could attach to Leibsohn would be if the Court found that Leibsohn had a duty to Plaintiffs.  The Court has found that Leibsohn had no duty by virtue of either his COO status or by virtue of being a control person.  Therefore, any common law fraud claims against Leibsohn must also be dismissed.

Based upon the files, records, and proceedings herein, **IT IS HEREBY**

**ORDERED**:

1.      Defendant Steve Leibsohn's Motion for Summary Judgment [Doc.

No. 59] is **GRANTED**;

2.      All claims against Steve Leibsohn are **DISMISSED**; and

3.      Steve Leibsohn shall be **TERMINATED** as a party in this action.


DATED: June 15, 2006

                                        s / Michael J. Davis
                                        Michael J. Davis
                                        United States District Court